# EXHIBIT 26

```
              UNITED STATES DISTRICT COURT

              SOUTHERN DISTRICT OF CALIFORNIA


DAVID SCHATZ, an individual,    )    CERTIFIED COPY
                                )
        Plaintiff,              )
                                )
    vs.                         )   Case No.:
                                )   3:20-cv-00513-H-LL
FLOWERS BAKING CO. OF HENDERSON,)
LLC, a Nevada limited liability )
company; and DOES 1 through 50, )
inclusive,                      )
                                )
        Defendants.             )
_____)



                    CONFIDENTIAL

              DEPOSITION OF MIA RODRIGUEZ

              VIA ZOOM VIDEOCONFERENCING

           TUESDAY, JANUARY 19, 2021, 1:30 P.M.





     Reported by Debra D. Smalley, RMR, CSR No. 8513
                    Job No. 713037B
```

```
 1            UNITED STATES DISTRICT COURT
 2            SOUTHERN DISTRICT OF CALIFORNIA
 3
 4  DAVID SCHATZ, an individual,    )
                                    )
 5          Plaintiff,              )
                                    )
 6      vs.                         )   Case No.:
                                    )   3:20-cv-00513-H-LL
 7  FLOWERS BAKING CO. OF HENDERSON,)
    LLC, a Nevada limited liability )
 8  company; and DOES 1 through 50, )
    inclusive,                      )
 9                                  )
            Defendants.             )
10  _____)
```

        DEPOSITION OF MIA RODRIGUEZ, taken via Zoom videoconferencing, on Tuesday, January 19, 2021, at 1:30 p.m., before Debra Smalley, Certified Shorthand Reporter, in and for the State of California.

```
 1   APPEARANCES:

 2   For Plaintiff:

 3          THE LAW OFFICE OF MATT BLUM
            BY:  MATTHEW M. BLUM, ESQ.
 4          550 West C Street, Suite 960
            San Diego, California 92101
 5          860.271.6273  Fax 619.238.1351
            mblumlaw@gmail.com
 6
     For Defendants:
 7
            OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
 8          BY:  FRANK L. TOBIN, ESQ.
                 CODY J. COCANIG, ESQ.
 9          4370 La Jolla Village Drive, Suite 990
            San Diego, California 92122
10          858.652.3100  Fax 858.652.3101
            frank.tobin@ogletree.com
11          cody.cocanig@ogletree.com

12   Also Present:

13          DAVID SCHATZ
            ADAM STONE
14

15

16

17

18

19

20

21

22

23

24

25
```

1  Q   Why couldn't David have been released to perform
2  part-time work where he did some administrative work
3  during the day?
4          MR. TOBIN:  Objection.  Vague and ambiguous.
5  Foundation.  Calls for speculation.  Incomplete
6  hypothetical.
7          THE WITNESS:  So we do not have any part-time
8  positions so we would, in essence, be creating a new
9  position for him.
10 BY MR. BLUM:
11  Q   What about simply reducing the time that he
12 went in as an area sales director and having somebody
13 else, for example, fill in for the other work, the
14 manual labor side, that he couldn't do?
15         MR. TOBIN:  Same objections.
16         THE WITNESS:  Well, with these restrictions,
17 I mean, the other person would still have to do the
18 whole responsibilities of an area sales director.
19 BY MR. BLUM:
20  Q   Well, David could do a couple hours a day of
21 administrative work; right?
22         MR. TOBIN:  Foundation.
23         THE WITNESS:  It still wouldn't be covering the
24 essential functions of the task, and really not even all
25 the -- just even the non-essential functions so the other

1  Q    Does Flowers have any part-time positions?
2       MR. TOBIN:  Foundation.
3       THE WITNESS:  We -- at the time that Mr. Schatz
4  was with us, no, we did not.
5  BY MR. BLUM:
6  Q    So as soon as Mr. Schatz asks to work part time
7  as an accommodation, was there any thought from Flowers
8  that we're going to accommodate this?
9       MR. TOBIN:  Objection.  Vague and ambiguous.
10 Foundation.
11      <u>THE WITNESS:  I mean, it would -- we definitely
12 took into consideration whether or not we could
13 accommodate his restrictions, but it was not based
14 fully on whether it was part time or not part time.</u>
15 BY MR. BLUM:
16 Q    Okay.  I want to look at a couple other
17 documents from these two sets of exhibits.
18 A    Okay.
19 Q    So let's look at number 6.
20 A    Okay.  I'm there.
21      MR. TOBIN:  Matt, when you say "two sets of
22 exhibits," I've only got one set.
23      MR. BLUM:  Two exhibits, Exhibit 1, Exhibit 2.
24 I'm sorry.
25      MR. TOBIN:  I see.  The two exhibits within the

1  A  I mean, it was not very clear throughout 2019
2  of when exactly he would return.
3  Q  What is unclear about it, ma'am?
4  A  Well, you see the return-to-work dates changed.
5  Q  By how many days?
6  A  And this was not -- yeah, this time it changed
7  by five days, but there were other notes.
8      So even though we're just looking at these
9  few notes, there were other notes that had different
10 return-to-work dates.
11 Q  Okay.  So you're saying that from the time
12 that David went out on leave around March 8th; right?
13 When his doctor released him to part-time work around
14 March 8th, you're with me on that; right?
15 A  Okay.
16 Q  Okay.  And at that time he's told "We cannot
17 accommodate part-time work"; right?
18 A  Okay.
19 Q  Okay.  From there on out, was there any
20 confusion, with respect to the doctors' notes he
21 provided Flowers, about when he would be able to
22 return to work without restriction?
23     MR. TOBIN:  Objection.  Vague and ambiguous.
24 Foundation.
25     THE WITNESS:  Well, the notes that we just

1  MR. TOBIN: Objection. Calls for speculation.
2  THE WITNESS: Honestly, I would not say he
3  lost his job.
4  BY MR. BLUM:
5  Q  How would you say it?
6  MR. TOBIN: Same objections. Vague and
7  ambiguous.
8  THE WITNESS: I mean, he went on inactive
9  status, so he -- at that time when he was inactive,
10 he was no longer -- I mean, yeah, he was inactive.
11 So at that time, you know, we -- based on
12 our business needs, you know, we needed somebody to
13 fill that role.
14 BY MR. BLUM:
15 Q  Why couldn't you hold the position open the
16 same way that you held open Richard Tupen's?
17 A  Honestly, they were different cases. They
18 had different circumstances.
19 Q  What?
20 MR. TOBIN: Foundation. Calls for speculation.
21 BY MR. BLUM:
22 Q  What were the different circumstances that
23 allowed you to hold Richard Tupen's position open for
24 him but did not allow you to hold David's open for him?
25 MR. TOBIN: Objection. Foundation. Vague and

1           MR. TOBIN:  Objection.  Vague and ambiguous.
2    Foundation.  Calls for speculation.  And incomplete
3    hypothetical.
4           THE WITNESS:  I mean, there was no one specific
5    thing that we're looking for.
6    BY MR. BLUM:
7       Q    He provided at least four doctors' notes
8    stating -- throughout that six-month period -- stating
9    his anticipated return date was late September of 2019;
10   right?
11      A    Yes.
12      Q    And he returned in late September of 2019;
13   correct?
14          MR. TOBIN:  Foundation.
15          THE WITNESS:  Yes.
16   BY MR. BLUM:
17      Q    Okay.  What more could he have done to give a
18   semblance of certainty as to when he was coming back?
19          MR. TOBIN:  Same objections.
20          THE WITNESS:  Again, even though some of
21   those notes indicated that, not all of the notes.  So
22   the history that we had was not consistent.
23          And again, these notes, you know, even though
24   they show a September return-to-work date, they were
25   provided in April and March.  So, you know, at that time,

1  <u>given that time frame from the date that the notes were</u>
2  <u>presented to the date of the expected return, a lot of</u>
3  <u>things could happen between then.  So there was still no</u>
4  <u>guaranteed return that he would return in September.</u>
5  BY MR. BLUM:
6      Q    From the time that David went out on leave in
7  March of 2019, did you ever reach out to him to ask how
8  his recovery was progressing?
9      A    I do believe I did.
10     Q    Okay.  Did you ever ask him whether he thought
11 he could return to work and work more than the initial
12 two hours?
13     A    I don't recall if that was specifically
14 discussed, but I mean, it was not off the table for
15 discussion.  If that's something he wanted to bring up
16 and discuss, we could have definitely spoken about it.
17     Q    Okay.  Did you ever bring it up with him?
18 Did you ever ask David, "David, now it's been a couple
19 months, can you come back and work more than two hours"?
20     A    I -- honestly, I don't recall if that specific
21 discussion was had.
22     Q    Did you ever tell David to let you know when
23 he would be cleared to work more than two hours so that
24 you could attempt to get him back into his position in
25 a part-time capacity?

BY MR. BLUM:

Q   Well, it existed three months earlier?

A   Right.  But he was -- Adrian was grandfathered into it, but no, we were advised from corporate that no other, you know -- we were not to hire anybody.

Q   Okay.  But why not just move Adrian back if he was already grandfathered in?  Why couldn't you just move Adrian back to the TOS spot where he was at before David went out on medical leave?

MR. TOBIN:  Same objections.

THE WITNESS:  <u>Because the position was eliminated.  You know, at that time we didn't -- you know, we weren't going to speculate, you know, as to whether or not, you know, Mr. Schatz was going to come back, and if so, you know, we had no idea, so, you know, Adrian was placed into the ASD position</u>.  You know, his position again, across the board, corporate initiative was to eliminate those salaried TOS positions, so that's what was done.  We offered him the position that we had available to offer him.

BY MR. BLUM:

Q   Did you ever go to corporate and ask them whether it would be acceptable to simply move Adrian back to the TOS position that he held before David had his leave denied and then allow David to come back as an